UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____3/29/19____

LINDA RANDOLPH,

        Plaintiff,

   -against-

NANCY A. BERRYHILL, ACTING
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

17-CV-6711 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Linda Randolph filed this action pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act (the Act), 42 U.S.C. §§ 405(g) and 1383(c)(3), challenging a final decision by the Commissioner of Social Security (Commissioner) denying her application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) (collectively, "benefits"). The parties consented to the disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Dkt. No. 17) and cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. Nos. 22, 30.) For the reasons that follow, the Court concludes that plaintiff meets all of the criteria of Listing 12.05(C) (intellectual disability) and is therefore disabled within the meaning of the Act. Consequently, the Commissioner's motion will be denied, plaintiff's motion will be granted, and this action will be remanded to the Commissioner solely for the calculation and payment of benefits.

## I.    BACKGROUND

### A.    Procedural Background

#### 1.    Initial Proceedings Before the Agency

Plaintiff filed her applications for benefits almost ten years ago, on November 16, 2009, alleging disability since June 1, 2008. *See* Social Security Administration (SSA) Administrative

Record (Dkt. No. 18) at 104, 108. (hereinafter "R."). On February 17, 2010, the SSA denied her applications. (R. 64.) Plaintiff timely requested a hearing before an Administrative Law Judge (R. 72) and on June 21, 2011, she appeared and testified, with counsel, at a hearing before ALJ Robert Gonzalez. (R. 26-60.) In a written opinion dated June 30, 2011 (the 2011 Decision), the ALJ determined that plaintiff was not disabled within the meaning of the Act. (R. 12-21.) Plaintiff requested that the Appeals Council review the ALJ's decision (R. 7), but on September 19, 2012, the Appeals Council denied plaintiff's request (R. 1-6), rendering the 2011 Decision final.

## 2. The First Court Action

On November 21, 2012, plaintiff sought review of the 2011 Decision in this Court. (R. 425.) The case was assigned to United States District Judge Laura Taylor Swain, and referred to United States Magistrate Judge James L. Cott for report and recommendation. (*Id.*) On June 30, 2014, Judge Cott recommended that the case be remanded to the Commissioner because the ALJ violated the treating physician rule. Judge Cott explained that the ALJ failed to "identify what weight, if any, he afforded to the opinion of Randolph's treating physician," psychiatrist Arudi Srihari, M.D., "and did not adequately set out the reasons for discounting his opinion." *Randolph v. Colvin*, 2014 WL 2938184, at *11 (S.D.N.Y. June 30, 2014). (R. 447-48.) Judge Cott also found that the ALJ failed to "proffer good reasons for giving the treating physician's opinion as little weight as he apparently did," in that he "failed to consider all of the relevant factors necessary for discounting a treating physician's opinion." 2014 WL 2938184, at *12. (R. 449, 450.) Judge Cott further recommended that, on remand, the ALJ should "make a renewed determination" regarding whether to consult a vocational expert, which he had not done at the 2011 hearing. 2014 WL 2938184, at *14. (R. 452.)

On July 23, 2014, Judge Swain adopted the report and recommendation in full, granted plaintiff's motion, denied the Commissioner's cross-motion, and remanded the case for further proceedings before the Commissioner. *See* Order Adopting Report and Recommendation, *Randolph v. Astrue*, No. 12-CV-8539 (LTS) (JLC) (S.D.N.Y. July 23, 2014).

### 3.      Further Proceedings Before the Agency

On March 10, 2015, plaintiff again appeared, with counsel, before ALJ Gonzalez. (R. 387-96.) Before any substantive testimony was taken, plaintiff's counsel noted that four years of plaintiff's treatment records from Dr. Srihari were still missing. (R. 388.) The ALJ noted that although subpoenas had been sent out for those records, no records had yet been received. (R. 389.) The ALJ closed the hearing pending receipt of the missing records. (R. 394.)

On May 15, 2015, plaintiff again appeared, with counsel, before ALJ Gonzalez, at which point the hearing went forward. (R. 350-84.) Vocational Expert (VE) Linda Stein also testified. (*Id.*) In a written decision dated February 3, 2016 (the 2016 Decision), the ALJ concluded, for the second time, that plaintiff was not disabled within the meaning of the Act. (R. 323-39.) On March 3, 2016, plaintiff requested that the Appeals Council review the 2016 Decision, and requested additional time to file specific exceptions. (R. 306.) Plaintiff later requested even more time to submit exceptions, but failed to file any. (*Id.*) The Appeals Council denied plaintiff's request for review on July 20, 2017, making the ALJ's 2016 Decision final. (R. 306-08.)

### 4.      This Action

Plaintiff filed this action, seeking judicial review of the 2016 Decision, on September 3, 2017. (Dkt. No. 1.) On December 12, 2017, the parties consented to the jurisdiction of a United States Magistrate Judge for all purposes. (Dkt. No. 17.) After a number of extensions, both parties filed motions for judgment on the pleadings. (Dkt. Nos. 22, 30.)

### B. Personal Background

Plaintiff was born on August 22, 1966, and was 43 years old on the date of her application.[1] (R. 337.) In high school, she was placed in special education classes, (R. 207, 1065, 1098, 1151, 1265), because she had "math and reading problems." (R. 194.) She explained to examining psychologists Lisa Orsini, Ph.D. and Melissa Antiaris, Psy.D., that she was "slow." (R. 207, 1151, 1265.) She completed the tenth grade, but never graduated high school. (R. 1265.) In her Disability Report, completed in connection with her application for benefits and dated November 16, 2009, plaintiff reported that she eventually earned a GED in 1991, at approximately age 25, while incarcerated. (R. 30, 129.) She has no other education or job training. (R. 35, 129.)

An IQ test administered on October 8, 2012 by Dr. Antiaris showed that plaintiff has a full scale IQ score of 63, which places her "in the extremely low range of intellectual functioning when compared to her peers overall." (R. 1268.) The same test yielded a verbal comprehension score of 66, which is also in the "extremely low range." (*Id.*) Plaintiff's standard reading score of 79 "places her in the 6th grade 4th month for grade equivalency." (*Id.*)

When she was eight or nine years old, plaintiff began "getting into fights" at school. (R. 194.) When she was 20, she started using crack cocaine, which she used intermittently until 2013, when she was approximately 47 years old. (R. 1057.)[2] She was arrested seven times, was

---

[1] Plaintiff was 51 years old on September 3, 2017, the date this action was filed, and is now 52 years old.

[2] On November 13, 2009 plaintiff told psychiatrist Anthony Capozzi, M.D. that she had been "sober since 3/19/09." (R. 195.) On April 9, 2014, she told psychologist Colin Schlossman, Ph.D. that while she ceased using crack cocaine in 2009, "[i]n 2012 she had a relapse due to her personal issues" but "has not used since that time." (R. 1065.) Similarly, plaintiff testified at the May 2015 hearing that she has been "clean" since 2013. (R. 377.)

incarcerated for an aggregate of nearly 17 years, all on drug-related offenses,[3] and was last released from prison in approximately May 2013. (R. 125-28, 1066.) In her Function Report, dated December 28, 2009, plaintiff listed her daily activities as attending daily sessions at a substance abuse program, seeing her therapist and psychiatrist once or twice a month, and watching TV with her family. (R. 136-37, 141.) After plaintiff was released from custody in 2013, she again attended outpatient drug treatment. (R. 1057, 1072.) Plaintiff has two daughters, now adults, who lived with plaintiff's sister. (R. 262.)

Plaintiff alleged disability due to bipolar disorder and borderline personality disorder. (R. 123.) In her Disability Report, she described racing thoughts, a short attention span, difficulty concentrating, difficulty following written and verbal instructions, and difficulty remembering things she had been taught. (R. 123, 131.) She was "always confused." (R. 131.) She also suffered from periods of depression, during which she had "to go to sleep." (R. 123.)

In her 2009 Function Report, plaintiff stated that she was living in an apartment "with family." (R. 136.) She did not take care of any family members (or pets), and was "never able to maintain anything such as raising children, work, housing, etc." (R. 137.) She could microwave

---

[3] Plaintiff testified generally, at her 2011 hearing, that she was in and out of jail in connection with drug offenses. (R. 31-32.) On February 2, 2010, she told Dr. Orsini that she was first incarcerated for six months, followed by sentences of three to six years, five to ten years, four and a half to nine years, two and one half to five years, and finally six and one half months, after which she was released from prison in 2009. (R. 209.) On April 9, 2014, she told Dr. Schlossman that as a result of her relapse, she was arrested again in April 2013 and spent an additional 30 days in jail, after which she was "remanded to Mental Health Court." (R. 1066.) This was a reference to the Westchester County Mental Health Court, a "pre-plea felony level diversion court." (R. 1072.) In a May 26, 2015 letter to ALJ Gonzalez, Mental Health Court Program Administrator Michelle Hart explained that plaintiff had "successfully completed outpatient substance abuse treatment" and was continuing to attend mandated mental health treatment at the Westchester Jewish Community Service Center (Westchester Jewish). (*Id.*) If she successfully completed the entire program in December 2015, "her charges will be reduced to misdemeanors." (*Id.*) At the May 2015 hearing, plaintiff testified that the program required regular drug testing. (R. 359.)

food but usually ate "with family." (R. 136-38.) At her 2011 hearing, she testified, "my mother cooks my meals." (R. 39.) Plaintiff could handle "basic chores," but could not travel by herself except on foot. (R. 137, 139.) Her driver's license was suspended. (R. 139.) She noted in her Function Report that she would be attending "transportation skills" classes "to learn how to travel to and from appointments on my own." (*Id*.) She could count change but had never had a saving account. (R. 140.) Plaintiff testified in 2011 that she was supporting herself with "Social service, and case management helps me pay some of my bills." (R. 41.)

By the time of her May 2015 hearing, plaintiff was living in "supported housing with Human Development Services of Westchester." (R. 1072.)[4] She testified that she had been in "mental health housing" since 2012 or 2013. (R. 375.) She was not permitted to smoke in the house, or cook, "because they think I'll start a fire." (R. 374-75.) Plaintiff's mother, who lived nearby, "makes my food and stuff." (R. 361.)[5]

Plaintiff reported no physical limitations. (R. 46, 141-43.)

Plaintiff has held jobs, but never for long. (R. 370.) In her Disability Report, she listed a job at Burger King for an unknown period; as a bus cleaner for part of 2003; and as a "maintenance cleaner" in 2007 and 2008. (R. 124.) She reported that she was fired from her last position, in 2008, for falling asleep on the job. (R. 123.)

---

[4] Human Development Services of Westchester offers several housing programs, with varying levels of support. *See Residential Services*, Human Development Services of Westchester, Inc., https://www.hdsw.org/residential-services (last visited March 29, 2019).

[5] Treatment notes from Westchester Jewish dated July 23, 2014, state that plaintiff was "participating in caring for her mother," who had been diagnosed with cancer, and "helping with the care of her 13yr old grandson." (R. 777.) At the May 2015 hearing, plaintiff testified that the care that she provided to her mother consisted of staying with her at the hospital (which was "across the street" from where plaintiff was living) "because she couldn't go to sleep," and later visiting her mother while she was recuperating from surgery in a nursing home. (R. 361-62.)

## II.     PLAINTIFF'S MEDICAL HISTORY

Both the Commissioner and the plaintiff have presented summaries of the medical evidence in their briefs. *See* Def. Mem. (Dkt. No. 23) at 2-14; Pl. Mem. (Dkt. No. 31) at 6-15. The summaries are consistent in all material respects, and the Court hereby adopts them. The Court will address the medical evidence pertinent to this Opinion and Order in Section IV.

## III.    HEARING

At the May 2015 hearing, the ALJ questioned plaintiff about her treatment at Westchester Jewish. (R. 358.) Plaintiff confirmed that her therapist was Kay Griffin and her psychiatrist was Dr. Srihari, whom she saw once a month, but also "sneak[ed] in every now and again." (R. 358.) Plaintiff also confirmed that her treatment was mandated by the Mental Health Court, including regular drug screenings, and that she would be under the court's supervision until January of 2016, (R. 359-60), at which point she would "get a misdemeanor" if successful. (R. 360.) Plaintiff testified that she was no longer caring for her mother, who had recovered and resumed making food for plaintiff. (R. 360-62.)

Under questioning from her own counsel, plaintiff testified that she saw her therapist weekly and called her regularly between sessions. (R. 364.) Plaintiff also spoke regularly with her case manager, Wanda Lee. (*Id*.) Plaintiff explained her case manager's role as follows:

Q:      What types of things does your case manager help you with?

A:      She helps me with – what does she help me with? She helps me with getting back and forth to appointments. She helps me in my house, in my apartment. She takes me to the store, teaching me how to get around and I don't know if she pays things for me, too, I guess, they take care of stuff that I can't do.

Q:      And did she help you get here today?

A:      Yes, she drove me.

(R. 364.)

Asked about her employment efforts since her last hearing, plaintiff testified that she attempted to work at a Salvation Army store but was asked to leave by store personnel after only 40 minutes. (R. 365.) Plaintiff explained that she was "discombobulated" and the manager "didn't want me in the store any more." (*Id.*)[6] Plaintiff also tried to work washing cars at a car rental agency, but did not receive any pay, because she had difficulty following her supervisor's instructions. (R. 367.) Looking at plaintiff's employment records, the ALJ asked her what she did in 2007 to generate some self-employment income, but plaintiff could not recall any work that year. (R. 368.) The ALJ also noted that plaintiff worked at Wal-Mart and Stony Lodge, but that "these jobs . . . don't last very long." (R. 370.)

At her first hearing in 2011, plaintiff had testified that she occasionally helped a friend sell hot dogs from a cart. (R. 45.) At her May 2015 hearing, however, she denied having ever done so. (R. 366.)

Plaintiff then testified about the medication she was taking – Zyprexa and Remeron[7] – and explained that despite the medication she sometimes felt depressed, at which point "[a] lot of things happen. The crisis team comes." (370-71.) More often, plaintiff felt "manic," explaining, "I'm like a roadrunner, I'm all over the place, bouncing, people have to tell me to sit down and be still, they rub my hands like I'm a kid." (R. 371.) When plaintiff felt "paranoid or suspicious of others," she started "thinking people are saying stuff and they're not saying." (R. 372.) Plaintiff testified that she had difficulties concentrating, which were partially ameliorated by medication, and difficulty

---

[6] This testimony is corroborated by a note from the store manager. (R. 1345.)

[7] Zyprexa "is an atypical antipsychotic medication used to treat schizophrenia and manic episodes of bipolar disorder." *Zyprexa*, Rxlist, https://www.rxlist.com/zyprexa-side-effects-drug-center.htm (last visited March 29, 2019). Remeron is used to treat major depressive disorder. *Remeron*, Rxlist, https://www.rxlist.com/remeron-drug.htm#indications (last visited March 29, 2019).

following instructions. (R. 372-73.) She was able to keep to a daily routine, but "might get discombobulated" if she were to add something to that routine. (R. 373.) Plaintiff also had difficulties dealing with stress (R. 373-74), and experienced mood changes, as a result of which "I'm rude and I'm exasperated and I don't want to talk and I'm going to hang up on you or I'm just bad." (R. 375.) Plaintiff added that she did not "really interact with anybody but my family really and my therapist and Wanda." (R. 376.)

Plaintiff also testified that she could drive on "little roads," but "not on the highway," and was unable to take public transportation, because "I'm agitating very easily and I just, I don't do that." (R. 376-77.) She told the ALJ that she had not used drugs since 2013. (R. 377.)

The ALJ then took testimony from the VE. He asked whether there were four jobs in the national economy that a hypothetical claimant of plaintiff's age, education and work history could perform, at any exertional level, if "the person has the following additional limitations: the person can understand, remember and carry out simple work; can adapt to routine workplace changes," and can "occasionally interact with supervisors, coworkers and the general public." (R. 380.) The VE responded that a hypothetical claimant with those limitations could work as a cleaner or housekeeper in any industry, as a hand bander, as a cleaner of laboratory equipment, or as a packager. (R. 380.) Plaintiff's attorney asked the VE whether an individual who was expected to be off task at least three times an hour, for five minutes at a time, could perform the same positions. (R. 381-82.) The VE responded that such a person could not perform those jobs, because "anything more than nine minutes beyond the scheduled breaks would be problematic." (R. 382.)

## IV.    THE ALJ'S DECISION

### A.    Standards

A five-step sequential evaluation process is used pursuant to 20 C.F.R. §§ 404.1520(a) and

416.920(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Therefore, to support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimant's residual functional capacity (RFC), age, education, and past relevant work experience. *See* 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.920(c).

## B. Application

Before turning to the five-step evaluation sequence mandated by 20 C.F.R. §§ 404.1520(a) and 416.920(a), the ALJ determined that plaintiff met the insured status requirements of the Act through September 30, 2011. (R. 325.)

At step one, the ALJ concluded that plaintiff had not engaged in any substantial gainful activity since the alleged onset date of her disability. (R. 326.) At step two, the ALJ found that plaintiff "has the following severe impairments: bipolar disorder, anxiety disorder, substance abuse disorder, borderline personality disorder, attention-deficit-hyperactivity disorder and mild mental retardation." (*Id.*)

At step three, the ALJ concluded that plaintiff's impairments or combination of impairments did not meet or medically equal the severity of any impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (2016) (the Listings). (R. 327.)[8] The ALJ specifically considered Listings 12.04 (affective disorders), 12.05 (intellectual disability), 12.06 (anxiety-related disorders), 12.08 (personality disorders), and 12.09 (substance abuse disorders).

At the time of the Decision, Listing 12.05 defined "intellectual disability" to mean "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period," that is, before age 22. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.05. The "required level of severity for this disorder" could be met one of four different ways, as laid out in subparagraphs (A), (B), (C), and (D), as follows:

> A.   Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR
>
> B.   A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR

---

[8] The Listings have been amended at various times since the ALJ's Decision. Throughout this Opinion and Order, references to the Listings are to those in effect at the time of the Decision.

C.      A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D.      A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

*Id.*; *see also DeCarlo v. Astrue*, 2009 WL 1707482, *4 n.5 (N.D.N.Y. June 17, 2009) ("To meet Listing 12.05, a claimant must satisfy the introductory paragraph, sometimes called the diagnostic description or a capsule definition, in addition to the criteria in one of the subparagraphs.").

ALJ Gonzalez found that plaintiff did not meet the paragraph A criteria of Listing 12.05 because she was not dependent on others for her personal needs and was able to shower and dress herself independently. (R. 328.) He found that she did not meet the paragraph B requirements because she did not have "a valid verbal, performance, or full scale IQ of 59 or less." (R. 329.) He found that she did not meet the paragraph D criteria because she had only "mild" restrictions in her activities of daily living (ADLs), "moderate" difficulties in social functioning and concentration, persistence, or pace, and one to two episodes of decompensation. (R. 327-38.) As for the paragraph C criteria of Listing 12.05, the ALJ found that plaintiff did not meet them because she "does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function as detailed further below." (R. 329.)

Before proceeding to step four, the ALJ determined plaintiff's RFC. (R. 329.) He found that plaintiff could perform "a full range of work at all exertional levels but with the following

non-exertional limitations: the claimant can understand, remember and carry out simple work; adapt to routine workplace changes; and, can occasionally interact with supervisors, coworkers, and the public." (R. 329.) In connection with his RFC determination, the ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were "not entirely credible." (R. 330.)

The ALJ reasoned that plaintiff's ADLs "are not limited to the extent one would expect, given [her] complaints of disabling symptoms and limitations," noting that plaintiff lived alone, took care of her personal needs, helped a friend sell hot dogs, got along with family, helped take care of her mother and grandson, successfully completed a drug treatment program, worked part time at a car rental service, and traveled to Las Vegas on vacation. (R. 332.)

The ALJ also found that plaintiff's treatment had been "essentially routine and/or conservative in nature," consisting of medication management and therapy, and "appears to have significantly helped the claimant's condition improve." (R. 332.) Further, the ALJ noted generally that although multiple treating and examining physicians opined that plaintiff was disabled, those opinions were not supported by their therapy notes, "opinions from Agency experts, and her activities of daily living." (R. 333.) Finally, according to the ALJ, plaintiff's sporadic work history "prior to the alleged disability onset date . . . raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments." (R. 333.)

In evaluating the opinion evidence in the record, the ALJ gave "very little weight" (R. 334, 335) to the opinions of plaintiff's long-time treating psychiatrist at Westchester Jewish, Dr. Srihari, and her treating therapist, Ms. Griffin, both of whom opined that the plaintiff had several "marked" limitations. (*See, e.g.*, R. 626, 633.) The ALJ concluded that these limitations were "not well

supported" by the treatment notes, other evidence in the record, plaintiff's ADLs, and the opinions of other examining and reviewing sources. (R. 333-35.)

The ALJ gave "great weight" to an early opinion rendered by J. Alpert, a non-examining expert[10] working for the New York State Division of Disability Determinations. (R. 335.) On February 17, 2010, based on his "paper" review of the medical record adduced thus far, Dr. Alpert opined that plaintiff had only "mild" limitations in her ADLs and social functioning, and moderate limitations in maintaining concentration, persistence or pace. (R. 230.) The ALJ found J. Alpert's opinion persuasive because "the doctor is a medical expert in psychology" and because his opinion was consistent with the mental status exams performed by "the consultative examiner" (presumably meaning Dr. Orsini, who performed a consultative examination of plaintiff on February 2, 2010), and with the "longitudinal treatment notes" from Westchester Jewish. (R. 335.)

Dr. Orsini found that plaintiff's attention, concentration, and memory skills were "impaired," that her cognitive functioning "[a]ppeared to be within the borderline range," that her insight was limited, and that her judgment was poor. (R. 210.) Dr. Orsini concluded that plaintiff was "able to perform simple tasks independently, but had difficulty "maintaining concentration" and "may have some difficulties maintaining a regular schedule." (R. 211.) The ALJ gave that opinion "some weight," except for her prediction that plaintiff would have trouble keeping to a schedule, which he found inconsistent with evidence in the record that plaintiff regularly attended her drug rehabilitation program appointments. (R. 335.)

The ALJ gave "great weight" to the opinion of psychologist Fredelyn Engelberg Damari, Ph.D., who evaluated plaintiff's limitations for the Westchester County Department of Social

---

[10] J. Alpert's credentials are not in the record, but he or she signed the form as a medical consultant in "psychiatry." (R. 220.)

Services (Social Services) on June 24, 2011. (R. 335.) Dr. Damari found that plaintiff's attention, concentration, and memory skills were "mildly impaired," that her cognitive functioning was "below average," that her insight was normal, but her judgment was only "fair." (R. 1190.) Dr. Damari concluded that plaintiff was "moderately" limited in performing complex tasks independently, but was capable of working for up to 40 hours per week, "with reasonable accommodations listed in Section C, if any." (R. 1191-92.) Dr. Damari did not list any accommodations in Section C of the form. (R. 1193.)

The ALJ then turned to the opinion of another Social Services evaluator, Dr. Antiaris, who examined plaintiff on October 8, 2012 and April 8, 2013. In 2012 Dr. Antiaris found plaintiff's attention and concentration "mildly impaired," her cognitive functioning "borderline," and her insight and judgment "fair." (R. 1267.) In 2013 she found plaintiff's attention, concentration, and memory "mildly impaired," diagnosed her with "[m]ild mental retardation," and again found her insight and judgment "fair." (R. 1153.) Dr. Antiaris concluded that plaintiff was "moderately" limited in performing complex tasks, maintaining concentration and attention for rote tasks, using public transportation, and performing even low stress and simple tasks, and therefore could not work. (R. 1154-55.) The ALJ gave Dr. Antiaris's opinions "very little weight" "[o]verall," explaining that her conclusions as to plaintiff's work limitations were "not consistent with substantial evidence." (R. 335-36.) The ALJ acknowledged that Dr. Antiaris "found the claimant to have a FSIQ of 63," but noted that "under Listing 12.05 there must be evidence that shows the claimant's adaptive functioning must be affected during [the] developmental period," and stated, "There is no substantial evidence to support such a finding." (R. 335.)[11]

_____

[11] There appear to be two April 8, 2013 assessments in the record from Dr. Antiaris. Both conclude that plaintiff had multiple "moderate" limitations and could not work, but they differ in certain details. (*Compare* R. 1151-56 *with* R. 636-42.) Among other things, the version at R. 636-42

The ALJ made short work of the remaining opinion evidence in the record, including Social Services evaluations conducted by Mark Weinberger, Ph.D. on December 12, 2011 (R. 1098-1103), by Dr. Schlossman on April 9, 2014 (R. 1065-70), and by Rachael Felsenfeld, Psy.D. on April 9, 2015 (R. 1382-87.) All three of these evaluations included a mental status exam and a function-by-function analysis of plaintiff's mental capabilities; all three found that she was "moderately limited" in certain areas and concluded that she could not work. The ALJ, however, rejected these psychologists' conclusions on the ground that their mental status exams failed to support their opinions, and characterized each of them, inexplicably, as "not a function-by-function assessment." (R. 336-37.)

At step four, the ALJ concluded that plaintiff had no past relevant work, was a younger individual with at least a high school education who could read and write in English, and found that there are jobs that exist in significant numbers in the national economy that plaintiff could perform at her RFC. (R. 338.) The ALJ found that plaintiff would be able to work as a cleaner, a hand bander, a lab equipment cleaner, or as a hand packager. (*Id.*) As there were significant numbers of these positions in the national economy, the ALJ concluded that plaintiff was not disabled under the Act. (R. 339.)

## V.     ANALYSIS

### A.     Standards of Review

Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). To prevail on such a motion, a party must establish that no material facts are in dispute and that judgment must be granted to that party as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842

---

reports the same IQ test results originally reported on October 8, 2012. (*Compare* R. 639-40 *with* R. 1267-68.)

F.2d 639, 642 (2d Cir. 1988); *Claudio v. Commissioner of Social Security*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The reviewing court may set aside a decision of the Commissioner only if it is "based on legal error or if it is not supported by substantial evidence." *Geertgens v. Colvin*, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting *Hahn v. Astrue*, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, where an applicant challenges the agency's decision, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi*, 2009 WL 50140, at *21 (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999), and *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation. "[O]nce an ALJ

finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation omitted).

The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Id.*; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014). However, if there are "gaps in the administrative record or the ALJ has applied an improper legal standard," the reviewing court may remand the case to the Commissioner for further proceedings. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996)) (internal quotation marks omitted). Moreover, if "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the appropriate remedy is to remand the case solely "for calculation and payment of benefits." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) (remanding for calculation and payment of benefits where the ALJ's determination "was not supported by any, much less by substantial, evidence"); *see also Rosa*, 168 F.3d at 83 (2d Cir. 1999) (where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits"); *Gibbs v. Colvin*, 155 F. Supp. 3d 315, 320 (W.D.N.Y. 2015) (remanding for calculation and payment of benefits where "the substantial evidence in the record establishes that plaintiff is presumptively disabled" under Listing 12.05(C)). A remand for calculation of benefits is particularly appropriate where the plaintiff's claim has been pending for a substantial period of time "and additional administrative proceedings would only lead to further delay." *Gibbs*, 155 F. Supp. 3d at 321.

### B.     The Parties' Contentions

The Commissioner, who filed her motion first, argues somewhat generically that the ALJ's RFC determination is supported by substantial evidence in the record, *see* Def. Mem. at 17-23; that the ALJ properly evaluated plaintiff's subjective complaints, *id*. at 23-24; and that his denial of the claim at step five should be affirmed. *Id*. at 25.

In her cross-motion, filed three months later, plaintiff advances three principal contentions. First, she asserts that the ALJ failed to give controlling weight to the opinion of plaintiff's treating psychiatrist, Dr. Srihari, and argues that had he done so, plaintiff would have been found disabled at step three under Listing 12.04 (affective disorders) because of her bipolar disorder. Pl. Mem. at 17-25. Second, she contends that she meets or medically equals Listing 12.05(C) because of her mild mental retardation (*id*. at 25-26), and for this reason as well should have been found disabled at step three. Third, she argues that the ALJ substituted his own opinion for those of the treating sources and examining sources who, for the most part, opined that plaintiff was significantly more limited than the ALJ himself concluded. *Id*. at 26-30.

The Commissioner did not file any opposition to plaintiff's motion.

The Court agrees with plaintiff that she meets each of the criteria under Listing 12.05(C). This conclusion requires a remand for the sole purpose of calculating and paying benefits. Consequently, the Court need not reach plaintiff's remaining arguments. *See Gibbs*, 155 F. Supp. 3d at 319-20.

### C.     The ALJ Erred at Step Three in Evaluating Listing 12.05(C)

Under the regulations promulgated by the Commissioner, if an individual has an impairment or combination of impairments that meet or medically equal a listed impairment, the impairments are considered to be "severe enough to prevent an individual from doing any gainful

activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a) (2011), 416.925(a) (2011). Thus, "[a]t step three, the ALJ considers the medical severity of the claimant's impairment(s) in determining whether the impairment(s) meets or equals one of the listings in C.F.R. Part 404, Subpart P, Appendix 1. A positive match directs a finding of disability." *Reyes v. Colvin*, 2015 WL 337483, at *9 (S.D.N.Y. Jan. 26, 2015).

Listing 12.05(C), at the time of the 2016 Decision, required three things for a "positive match": (1) A valid verbal, performance, or full scale IQ of 60 through 70; (2) a physical or other mental impairment imposing an additional and significant work-related limitation of function; and (3) deficits in adaptive functioning initially manifested before age 22. *See Marmer v. Colvin*, 2014 WL 1365471, at *3 (E.D.N.Y. Apr. 7, 2014) (quoting *Talavera v. Astrue,* 697 F.3d 145, 153 (2d Cir. 2012)) (Listing 12.05(C) "requires (1) '[a] valid verbal, performance, or full scale IQ of 60 through 70;' (2) 'a physical or other mental impairment imposing an additional and significant work-related limitation of function;' and (3) 'deficits in adaptive functioning that arise from [a claimant's] cognitive limitations.'"); *Ali v. Astrue*, 2010 WL 889550, at *4 (E.D.N.Y. Mar. 8, 2010) ("to establish disability under § 12.05(C) of the listing, [plaintiff] must show three things: (1) below-average intellectual function with adaptive functioning deficits manifested before age 22 and continuing during the claim period, (2) a valid IQ score of 60 through 70, and (3) an impairment, other than his low IQ, that imposes 'an additional and significant work-related limitation of function.'") (footnote omitted); *accord DeCarlo*, 2009 WL 1707482, *4.

### 1. IQ Score

In this case, it is clear that plaintiff has a qualifying IQ score. As the ALJ noted, her full-scale IQ, measured on the WAIS-IV, [13] is 63. (R. 335.) In addition, plaintiff's verbal comprehension score is 66. (R. 1267-68.) Both are within the "extremely low range of intellectual functioning" (*id.*), and either one of them, standing alone, would be sufficient to meet Listing 12.05(C)'s IQ score requirement. *See Ali*, 2010 WL 889550, at *5 n.3 (though all of plaintiff's scores "were in the 60 to 70 range, the test would have sufficed for § 1205(C)'s purposes even if only one of the scores had fallen in that range"); 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(6)(c) ("In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."). Moreover, there are no competing IQ scores in the record, and no suggestion in the 2016 Decision that plaintiff's scores on the WAIS-IV are invalid in any way. [14]

---

[13] "The Wechsler Adult Intelligence Scale (WAIS) is the most commonly used adult IQ test for measuring intelligence." PB International, "Wechsler Adult Intelligence Scale (WAIS)," https://wechsleriqtest.com/wechsler-adult-intelligence-scale/ (last visited March 29, 2019). The current version of the test, known as WAIS-IV, returns scores on four separate indices of adult intelligence, as well as a "full scale" IQ score, all normed on 100. *Id.* Scores of 90-109 are considered "average," while scores of 80-89 are termed "low average," and scores of 71-79 denote "borderline intellectual functioning." *Id.* "Moderate retardation occurs from about 50-70, and severe retardation at IQs below 50." *Id.*

[14] The ALJ gave Dr. Antiaris's opinion "very little weight regarding moderate limits in simple unskilled work" (R. 335), but found no deficiencies in her underlying clinical findings. To the contrary: the ALJ relied on her mental status exam and other "clinical findings" to "support that the claimant can sustain unskilled work." (R. 336.) In any event, the results of the WAIS-IV are consistent with plaintiff's self-report that she was placed in special education classes because she was "slow" (R. 207, 1151, 1265), and with the observations of other examining experts , including Dr. Orsini, who assessed plaintiff's cognitive functioning as "within the borderline range" and noted her "somewhat limited" general fund of information (R. 210); Dr. Srihari, who reported that she had a "low IQ" (R. 632); and Dr. Damari, who found her cognitive functioning to be "below average." (R. 1190.) As noted above, the ALJ made an affirmative finding at step two that plaintiff's "severe" impairments included "mild mental retardation." (R. 327.) Under DSM-IV (the last edition to use the term "mental retardation" instead of "intellectual disability"), the criteria for this diagnosis include an IQ of 70 or below. American Psychiatric Association, *Diagnostic and*

"[B]ecause courts presume that an individual's IQ remains relatively constant throughout his life, evidence of an IQ test administered in adulthood 'suffices to meet [the] prima facie burden of establishing that [a claimant] suffers from significantly subaverage general intellectual functioning . . . initially manifested . . . before age 22.'" *Newell v. Colvin*, 2017 WL 1200911, at *4 (S.D.N.Y. Mar. 31, 2017) (quoting *Talavera*, 697 F.3d at 152); *accord Marmer*, 2014 WL 1365471, at *4 ("Marmer is entitled to the presumption that his sub-average general intellectual functioning 'initially manifested prior to age 22' because there is no evidence in the record indicating otherwise.").

### 2. Other Mental Impairment

It is also clear that plaintiff has a qualifying "physical or other mental impairment imposing an additional and significant work-related limitation of function." This aspect of Listing 12.05(C) is satisfied by any other impairment that qualifies as "severe" at step two of the five-step analysis. *See Newell*, 2017 WL 1200911, at *4 ("the standard for determining whether a claimant meets the last requirement of Listing 12.05C – an additional severe physical or mental impairment – is whether the additional impairment qualifies as 'severe' as defined in step two of the five step sequential analysis"); *accord Marmer*, 2014 WL 1365471 at *4; *Baneky v. Apfel*, 997 F. Supp. 543, 546 (S.D.N.Y. 1998); 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A) (2016) (for purposes of Listing 12.05(C), "we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in [20 C.F.R.] §§ 404.1520(c) and 416.920(c)"). Thus, in determining whether a claimant meets the "physical or other mental impairment" prong of

---

*Statistical Manual of Mental Disorders* 40 (4th ed. 1994). Thus, the ALJ could not have made his step two determination without crediting the scores reported by Dr. Antiaris.

Listing 12.05(C), courts look to whether the ALJ found that the plaintiff had any additional severe limitations at step two of the five-step analysis. *See Lebron v. Berryhill*, 2018 WL 4658808, at *17 (S.D.N.Y. June 11, 2018) ("the ALJ found at step two that Plaintiff had three severe impairments: a learning disorder, borderline intellectual functioning, and a depressive disorder. Accordingly, the second requirement under 12.05(C) was met"), *report and recommendation adopted in part sub nom. Lebron v. Colvin*, 2018 WL 3471815 (S.D.N.Y. July 18, 2018).

In this case, the ALJ found at step two that plaintiff had several severe impairments above and beyond her limited intellectual functioning, including "bipolar disorder, anxiety disorder, substance abuse disorder, borderline personality disorder, [and] attention-deficit-hyperactivity disorder." (R 326.) This finding is sufficient to satisfy the requirement that the plaintiff have an additional and significant work related limitation of function pursuant to Listing 12.05(C). *Lebron*, 2018 WL 4658808 at *17; *see also DeCarlo*, 2009 WL 1707482, *4 (ALJ's step two finding that plaintiff had the "severe impairments" of asthma, obesity, ankle pain, depression, and anxiety disorder, in addition to an intellectual impairment, was sufficient to meet the requirement that the claimant have a "physical or other mental impairment imposing an additional and significant work-related limitation of function").[15]

### 3. Deficits in Adaptive Functioning Manifesting Before Age 22

The only remaining question is whether plaintiff had deficits in adaptive functioning that manifested during the developmental period. The term "adaptive functioning" is not defined in the regulations. "The plain language of the regulations, however, does not require a complete lack of

---

[15] As noted above, the ALJ stated, at step three, that Listing 12.05(C) was not met because "the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function as detailed further below." (R. 329.) This cannot be reconciled with his step two findings and was clear error.

adaptive functioning." *Ali*, 2010 WL 889550, at *5; *see also Rivera v. Schweiker,* 717 F.2d 719, 722 (2d Cir. 1983) ("The claimant need not demonstrate that he is completely helpless or totally disabled."). Courts in this Circuit "have analyzed adaptive functioning to mean 'a claimant's effectiveness in areas such as social skills, communication, and daily living skills.'" *Vargas v. Astrue*, 2011 WL 9518014, at *12 (S.D.N.Y. Nov. 8, 2011) (quoting *West v. Commissioner of Social Security Administration,* 240 F. App'x. 692, 698 (6th Cir. 2007)), *report and recommendation adopted,* 2012 WL 5845539 (S.D.N.Y. Nov. 19, 2012). "Adaptive functioning refers to an individual's '[] ability to cope with the challenges of ordinary everyday life.'" *Talavera*, 697 F.3d at 153 (quoting *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007)).

"Factors that courts consider when evaluating a claimant's adaptive functioning include communicating and socializing with others, living on one's own, paying bills, caring for children, shopping, cooking, cleaning, driving and other activities of daily life." *Newell*, 2017 WL 1200911, at *4. While no single factor, and no pre-determined group of factors, is dispositive of a plaintiff's adaptive functioning, courts in this Circuit tend to place significant weight on whether the plaintiff required special education classes, is unable to drive or use public transportation, has difficulties with social relationships outside of the family, and is unable to manage his or her own finances. *See*, *e.g.*, *Marmer*, 2014 WL 1365471, at *5 (holding that plaintiff adequately demonstrated deficits in adaptive functioning where the record showed that he took special education classes as a youth, lived with his mother, took public transportation "only when he has to," had little social life, and had never maintained significant employment); *DeCarlo*, 2009 WL 1707482, *5 (remanding for a calculation of benefits where plaintiff "attended special education classes" and graduated high school "only with an IEP," failed cosmetology classes because they were too difficult, was "unable to pay her bills, handle money, or count change," had reading difficulties

and "memory deficits," and "generally relie[d] on her mother to go shopping, drive places, and help care for her children").

Conversely, where the evidence shows that the plaintiff "meaningfully participate[d] in the care of her young children," completed ten years of education in ordinary classes (rather than special education classes), and experienced no reported difficulties in functioning before the onset of back problems, the Second Circuit agreed that the plaintiff did not have qualifying deficits in adaptive functioning. *Talavera*, 697 F.3d at 153; *see also Burnette v. Colvin*, 564 F. App'x 605, 607-08 (2d Cir. 2014) (finding no deficits in adaptive functioning where plaintiff "reported graduating from high school without special education classes, maintaining a job for some time after high school, and briefly attending college. Additionally, although she reported sometimes needing help with cooking, cleaning, and laundry, she has nevertheless been able to live alone, obtain a driver's license, take public transportation, shop for food, and pay her bills."); *Hoyt v. Colvin*, 2016 WL 3681425, at *6 (S.D.N.Y. Mar. 4, 2016) (substantial evidence supported ALJ's finding that plaintiff did not have deficits in adaptive functioning where plaintiff could, *inter alia*, prepare meals every day, perform basic household chores, travel independently by public transportation, prepare and follow a shopping list, pay bills, and handle a savings account), *report and recommendation adopted,* 2016 WL 3676673 (S.D.N.Y. July 6, 2016).

A plaintiff must also show that his or her "deficits in adaptive functioning . . . 'initially manifested . . . before age 22.'" *Talavera*, 697 F.3d at 153 (quoting Listing 12.05(C)); *see also Ali*, 2010 WL 889550, at *5 ("To qualify under § 12.05, the plaintiff must show that the adaptive function deficits manifested before he reached the age of 22."); *Carrube v. Astrue*, 2009 WL 6527504, at *3 (N.D.N.Y. Dec. 2, 2009) (to qualify under Listing 12.05(C), plaintiff must show "below average intellectual function with adaptive functioning deficits manifested before age 22

*and* continuing during the claim period") (emphasis added), *report and recommendation adopted,* 2010 WL 2178499 (N.D.N.Y. May 28, 2010).

Because many adult claimants cannot present direct evidence of their deficits in adaptive functioning before age 22, "[c]ourts have found circumstantial evidence sufficient to infer deficits in adaptive functioning prior to age 22. Examples include that a claimant attended special education classes; dropped out of school before graduation; or had difficulties in reading, writing, or math." *Ali*, 2010 WL 889550, at *5 (collecting cases). Other acceptable circumstantial evidence includes hearing testimony or statements made to treating or other examining providers regarding the claimant's adaptive function prior to age 22. *Fuimo v. Colvin*, 948 F. Supp. 2d 260, 267 (N.D.N.Y. 2013) (accepting plaintiff's testimony and statements to medical sources as evidence of deficits in adaptive functioning prior to age 22); *Devoe v. Barnhart*, 2006 WL 1272614, at *6 (D. Conn. Mar. 15, 2006) (same). An ALJ may also take a claimant's "work history into account when making a factual finding as to whether the claimant had deficits in his adaptive function prior to the age of 22." *Ali*, 2010 WL 889550 at *6.[16]

In this case, the ALJ correctly stated the law – that Listing 12.05 requires "evidence that shows the claimant's adaptive functioning must be affected during the developmental period" –

---

[16] Ordinarily, evidence that a claimant failed to maintain gainful employment even before the alleged onset date of her disability counts against her allegation of disability-related impairments. The ALJ made this point in his 2016 Decision, stating that plaintiff Randolph "only worked sporadically prior to the alleged disability onset date, which raises a question as to whether [her] continuing employment is actually due to medical impairments." (R. 333.) However, because intellectual disability tends to be a lifelong condition – and indeed must have manifested before age 22 to qualify under Listing 12.05(C) – a claimant's persistent inability to obtain or hold employment, even before the onset date of her other impairments, may furnish evidence in support of her claim that her deficits in adaptive functioning manifested during the developmental period. *See Decarlo*, 2009 WL 1707482, at *8 ("Plaintiff's work history further supports the Court's conclusion [that she currently has deficits in adaptive functioning] as it consisted of various short stints of work each lasting no longer than three to six months.").

but concluded, in the next sentence, that "there is no substantial evidence to support such a finding." (R. 335.) This was error.

Plaintiff has presented ample evidence that she has deficits in adaptive functioning that initially manifested prior to age 22 and have persisted into adulthood. Plaintiff has consistently reported that she was placed in special education classes because she was "slow," had trouble with both math and reading, and only completed the 10th grade, later obtaining a GED while incarcerated. (R. 30, 35, 129, 194, 207, 636, 1065, 1098, 1151, 1265.) Plaintiff also reported that she had behavioral issues in school ("getting into fights") from the age of eight or nine, and that she began psychiatric outpatient treatment at the age of 15. (R. 194, 1053, 1057.) There is no contradictory evidence in the record as to these facts. Plaintiff has thus demonstrated the onset of deficits in adaptive functioning during the developmental period. *Accord Decarlo*, 2009 WL 1707482, at *6 (remanding for calculation of benefits where plaintiff "had deficits in intellectual and adaptive functioning manifested by, *inter alia,* her long history of special education, problems with reading comprehension and verbal skills, and profound difficulties with mathematics and money.").

Plaintiff has also demonstrated that she continues to have significant deficits in adaptive functioning. She has "never been able to maintain anything such as raising children[,] work[,] housing etc." (R. 137.) Once out of custody in 2009, plaintiff resided with adult family members (*e.g.*, R. 194), and since 2012 or 2013 she has been in supportive housing ("mental health housing") provided by a local social services agency. (R. 375, 1072.) Plaintiff also receives support from a case manager who is in constant communication with her, helps with her apartment, takes her shopping, drives her to appointments, and generally "take[s] care of stuff that I can't do." (R. 24, 28-29, 53, 205, 207, 364, 636, 694, 1072, 1151, 1188, 1265, 1289, 1374, 1407.) Plaintiff cannot

drive "on the highway" or take public transportation. (R. 376-77, 1188, 1289.) She can microwave a meal or boil simple foods (R. 138), but is not allowed to use the stove in her supportive housing unit and relies on her mother, who lives nearby, to cook her meals. (R. 39, 361.) Although she reported to her therapist that she participated in caring for her mother during an illness, it appears that her participation consisted primarily of keeping her mother company in the hospital and then in a nursing home. (R. 361-62.)

In her Function Report, plaintiff stated that she could count change but never had a savings account. (R. 140.) Dr. Orsini opined that plaintiff "will need assistance from family to manage funds." (R. 212.) Plaintiff testified in 2011 that "case management helps me pay some of my bills" (R. 41) and in 2015 that she did not know whether her case manager "pays things for me." (R. 364.) During what appears to have been a brief period in private housing in 2012, plaintiff fell behind in her rent and was evicted. (R. 876, 917.)

Plaintiff maintains relationships with family members, but noted during her 2011 hearing that when she visits family they "kick [her] out all the time." (R. 40.) She further testified that although she spends time texting friends, she does not have a lot of them, only "some special ones . . . that deal with me." (R. 44.) Her therapist, Ms. Griffin, reported in 2011 that despite progress in treatment, plaintiff "gets into physical fights with her children and 'boyfriends' instead of using verbal skills." (R. 1451, 1456.)

There is virtually no evidence to suggest that plaintiff is capable of caring for children alone. Therapy notes from 2010 show that plaintiff "had her grandson over" on a Saturday afternoon but went into "overload" when the child's aunt was six hours late picking him up, because plaintiff could not tolerate his "active behavior." (R. 1016.) The following year, plaintiff told her therapist that she was concerned that her grandson (who lived with plaintiff's sister) was

being neglected, but was unable to care for him herself. (R. 1452.) There is some evidence that plaintiff either "help[ed] with the care" of her grandson or had him come to live with her in 2014, when the boy was 13 (R. 777, 810), but she was "concerned about how having the grandson will affect her" (R. 810), and the record does not disclose how the arrangement worked out.

Plaintiff's inability to hold a job throughout most of her adult life (*see* R. 370) and her markedly unsuccessful efforts to work at a Salvation Army store and wash cars at a car rental agency in 2015 (R. 365-67, 1345) furnish further evidence of her persistent deficits in adaptive functioning, which in this Court's view are at least as severe as those in other cases where courts have found plaintiffs disabled under Listing 12.05(C) and remanded solely for the calculation of benefits. *See*, *e.g.*, *Marmer*, 2014 WL 1365471, at *5 (plaintiff could use public transportation when he had to, but took special education classes, lived with his parents, had no spouse or children, and had difficulty maintaining social relationships); *DeCarlo*, 2009 WL 1707482, at *5-6 (plaintiff graduated from high school under an IEP, had substantial difficulties with arithmetic and reading comprehension, "had to be reminded of daily tasks," and relied on her mother for help shopping, going to appointments, and caring for her children).

### D. Remedy

Under section 405(g) of the Act, the Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Where, as here, "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the appropriate remedy is to remand solely "for calculation and payment of benefits." *Parker*, 626 F.2d at 235. If "the Court can determine from the record that [plaintiff] satisfies the requisite elements of Listing 12.05(C),

remand for further administrative proceedings is unnecessary." *Marmer*, 2014 WL 1365471, at *6. *See also DeCarlo*, 2009 WL 1707482, at *7 (remanding solely for calculation and payment of benefits under Listing 12.05(C) because the "fully developed record provide[d] persuasive proof" that the plaintiff met the criteria for that Listing); *Gibbs*, 155 F. Supp. 3d 320 (same); *Kennerson v. Astrue*, 2012 WL 3204055, at *7, 16 (W.D.N.Y. Aug. 3, 2012) (same).

In this case, as in *Marmer*, the voluminous record now before the Court compels the conclusion that that plaintiff's "mental impairment meets the requisite elements of Listing 12.05(C)," 2014 WL 1365471, at *6. Moreover, plaintiff's claim has now been pending for nine and a half years, and has already been remanded once, to no avail. Therefore, "remand for the calculation and payment of benefits is the proper remedy." *Id*.

## VI.    CONCLUSION

For the reasons stated above, the Commissioner's motion is DENIED, plaintiff's motion is GRANTED, and this action is REMANDED to the Commissioner for the purpose of calculating and paying the benefits due to plaintiff.

The Clerk of Court is respectfully directed to close the case.

Dated: New York, New York
       March 29, 2019

SO ORDERED.

_____
**BARBARA MOSES**
**United States Magistrate Judge**